**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GRAHAM B.C. ROMAN**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-1662-KSM** |
| **COUNTY OF CHESTER,** et al., | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                     **November 20, 2024**

*Pro se* Plaintiff Graham B.C. Roman was held at Chester County Prison ("CCP") from August 21, 2021 through June 18, 2024 while he awaited trial and then sentencing on multiple charges for child sex offenses. *See Commonwealth v. Roman*, Nos. CP-15-CR-0003288-2021, CP-15-CR-003306-2021, Criminal Dockets (Chester Cnty. Ct. Comm. Pl.).[1]  He brings claims under 42 U.S.C. § 1983 for violations of his First, Eighth, and Fourteenth Amendment rights against the County of Chester, multiple prison officials[2] (collectively, the "County Defendants"), PrimeCare Medical, Inc. (the prison's medical services provider), and Aramark Correctional Services, LLC[3] (the prison's food services provider).  (*See* Doc. No. 17 at 4–8; Doc. No. 30 at 11.)  The County Defendants and Aramark have each submitted a motion to dismiss Roman's

---

[1] In December 2023, a jury found Roman guilty on many of those charges, and in April 2024, he was sentenced to between 10.5 and 21 years' incarceration.  *See Commonwealth v. Roman*, Nos. CP-15-CR-003306-2021, CP-15-CR-003288-2021, Criminal Dockets (Chester Cnty. Ct. Comm. Pl.).  Roman is currently confined at SCI Rockview.

[2] The individual Defendants are:  Warden Ronald Phillips; Deputy Warden Ocie Miller; Director Tim Mulrooney; Major Morgan L. Taylor; Captain Peter Sergi; Sergeant Matthew Taylor; Sergeant Mark Di Orio; Deputy Warden George Roberts.

[3] Roman incorrectly identifies Aramark Correctional Services, LLC as "Aramark Food Provider Inc." in his pleadings.  (*See* Doc. No. 103 at 1.)

Amended Complaint and Supplemental Complaint (collectively, "the Complaint") pursuant to

Federal Rule of Civil Procedure 12(b)(6).  (Doc. Nos. 101, 103.)  Roman opposes those motions.

(*See* Doc. No. 106.)  For the reasons discussed below, the County Defendants' motion is granted

in part and denied in part, and Aramark's motion is granted.

## I.    FACTUAL BACKGROUND

Roman's Complaint is lengthy and somewhat difficult to follow.  However, taking the

allegations in the Complaint as true and viewing them liberally as the Court must, Roman alleges

that while he was detained at CCP he was denied access to necessary medical care and CCP

officials retaliated against him for submitting complaints and grievances.  (Doc. No. 17 at 8.)

### A.    Medical Care

First, Roman argues that he was denied necessary dental and mental health care while at

CCP.

#### 1.    <u>Dental Care</u>

Roman suffers from osteogenesis imperfecta, which is more commonly known as "brittle

bone disease."  *See* https://www.niams.nih.gov/health-topics/osteogenesis-imperfecta (last

visited Apr. 23, 2024).  It is a genetic disorder characterized by fragile bones that break easily.

*Id.*  According to Roman, his condition requires regular preventative and corrective dental

treatment "due to higher rate of decay" and "tooth chips."  (Doc. No. 17 at 14.)

Roman claims he informed a PrimeCare employee of his condition during his intake

exam on August 21, 2021 and told him that he had scheduled appointments for dental care before

he reported to CCP, which would need to be rescheduled with the prison's dentist.  (*Id.*; *see also*

*id.* at 24.)  According to Roman, the PrimeCare employee performing the exam responded that

the prison's policy does "not allow the Dentist to correct or repair . . . only extract or leave until

released."  (Doc. No. 17 at 14; *see also id.* at 24.)  Roman claims extraction is not a viable option

because he cannot "replace teeth due to bone weakness and prior jaw fractures." (*Id.* at 14.)

Despite allegedly needing corrective care when he entered CCP, Roman claims that he "was

given treatment" only "after 20+ months of delay" and significant suffering. (*Id.*; *see also id.* at

12 (alleging that he was "refused corrective action and proventitive [sic] action while housed as a

pre-trial detainee for 19 months straight").)

Roman did finally see a dentist in April 2023.  On April 26, 2023, he was examined and

told that a prior dentist had "made [a] few mistakes." (*Id.* at 21.)  When Roman asked the

Primecare dentist why he was being denied "corrective and preventitive [sic] care over a period

of 20 months with a genetic Bone Disability, [the dentist] could not explain except to say the

policy [and] customs in place limit the[ ] options of care," in that dentists "are only approved to

medicate or extract teeth." (*Id.* at 21.)  The dentist also told him that unidentified "officers

refused to escort [Roman] on April 19th when [the dentist initially] order[e]d a[n] appointment."

(*Id.*)  The next day, Roman saw the dentist again.  The dentist explained that he had "reported the

extream [sic] injur[ie]s due to 20 months delay" to CCP administration and told them that

Roman "need[s] a specialist/surg[e]on to . . . prevent any more damage and possibly extractions,

root cannal [sic], cavity repair[.]" (*Id.*)

While CCP searched for a specialist, Roman was placed on a prescribed soft food diet

beginning May 31, 2023.  (Doc. No. 30 at 10; *id.* at 21.)  Roman claims that Aramark, despite

being aware of Roman's dietary needs, denied "his prescribed medical diet . . . [for] NO reason,

causing further injury to [his] teeth." (*Id.* at 7, 9–10, 14–15, 18, 21.)

### 2.     Mental Health Care

In addition to suffering from osteogenesis imperfecta, Roman also claims that he suffers

from "severe mental health disabilit[ies]" that "he has battled since the age of (13)." (Doc. No.

17 at 15.)  According to Roman, he told this to the PrimeCare employee during his intake

examination, but CCP officials nevertheless refused to house him "on the mental health block (M)" or to let him attend "appointments." (*Id.* at 24.)

## B.     Retaliation

While at CCP, Roman filed numerous complaints against the correctional officers overseeing his confinement.  Roman claims the County Defendants have retaliated against him for those complaints in that they used the prison's suicide prevention policy to sexually harass him, refused to escort him to necessary medical appointments, interfered with his attempts to file grievances, and repeatedly moved him from cell to cell for no penological purpose.

### 1.     <u>Suicide Prevention</u>

First, Roman claims that he was sexually harassed by Defendant Sergeant Mark DiOrio. At some unidentified time, Sergeant DiOrio instituted CCP's suicide prevention policy against Roman after "a[n] argument." (Doc. No. 17 at 10.)  Roman alleges that even though he was "compliant," "nonaggressive," and told Sergeant DiOrio that he had "NO suicidal or homicidal thoughts," Sergeant DiOrio nevertheless "forced" him to go to medical. (*Id.* at 10, 15.)  Per the prison's suicide prevention policy, Roman was required to change out of his clothes and into a "suicide smo[c]k," but according to Roman, the smock was "way to[o] small," and he was required to drape the smock "over [his] shoulder . . . to cover [his] private parts." (*Id.* at 16.)  He claims that Sergeant DiOrio watched him as he changed into the smock and that female prison staff were on the block during this time. (*Id.*)  Roman alleges that he asked Sergeant DiOrio for permission to file a complaint under the Prison Rape Elimination Act ("PREA") related to the incident, but was "refused PREA access for over 2 hours until Sgt. Mark Diorio allowed it." (*Id.*)  Roman was "released the next day after investigation proved [he] was not suicidal." (*Id.* at 16–17.)

### 2.    **Medical Escorts**

Next, Roman claims he was "refused medical/dental visits due to staff refusing to escort [him] to appointments due to classification status." (*Id.* at 23.)  Roman also alleges that he "became a target for months" after filing the PREA complaint, in that Sergeant DiOrio "refused" to provide "medical escorts." (*Id.* at 17.)  Also, as noted above, Roman alleges that on April 26, 2023, his dentist told him that unidentified "officers refused to escort [Roman] on April 19th when [the dentist initially] order[e]d a[n] appointment." (*Id.* at 21.)

### 3.    **Grievance Interference**

Third, Roman alleges that Defendant Sergeant Taylor interfered with Roman's "grievance requests and inmate request slips." (*Id.* at 17.)  Roman claims he "made extensive reports to [CCP's] medical/mental health" department and the "security department" and "all defendants in administration," but "to no avail" because "the request slips" were never received. (*Id.*)  Roman believes they were not received because Sergeant Taylor "screens[,] interferes, and returns" the grievances "with a[n] answer (NO)!" (*Id.*)  Roman nevertheless concedes that he was able to appeal at least one grievance denial to Defendant Captain Sergi, who upheld the denial. (*Id.*; *see also id.* at 20, 31, 61.)  And the documents attached to the Complaint show that at least two grievances were appealed to Defendant Warden Phillips, who similarly upheld the denials. (*Id.* at 36, 60–61.)

### 4.    **Cell Transfers**

Last, Roman alleges that all the individual Defendants "were involved in a campaign of harassment towards" Roman, moving Roman from "cell to cell" as a punishment for his "many attempts to file a grievance" against unidentified officers. (*Id.* at 11.)  Roman claims he was "moved (18) times in under (17) months" with "around 5 moves" due his "own actions," and the remaining 13 moves "based on provoked retaliation that [began on] 06/08/2022," when he filed

his PREA complaint.  (*Id.* at 18.)  Roman claims there was "no penological security based reason" for the continued moves, and that it can "be assumed" the moves were meant to cause Roman to suffer "a mental break down." (*Id.* at 11.)

Roman discusses one instance in detail, alleging that he was moved five times over a three-day period in February 2023.  On February 21, 2023, nondefendant "Sergeant Ramos" moved Roman from cell 32 because it lacked "power [and] cable access" after having been damaged the previous day.  (*Id.* at 19.)  Sergeant Ramos also allegedly "emailed security over the fear [that Roman] was being targeted by" other officers, who were "using cell moves as punishment to expressing grievance issues involving Sgt. Taylor, Sgt. DiOrio."  (*Id.*; *see also id.* at 33–34, 37–38.)  The next day, February 22, Sergeant Taylor returned Roman to cell 32, telling Roman that he should not have gone "over [Sergeant Taylor's] head by being moved by a different Sgt. 'Ramos'" and that Roman "will learn [a] lesson now[.]"  (*Id.* at 19.)  Later that afternoon, Sergeant Ramos moved Roman back to the undamaged cell, and the next morning, February 23, Sergeant Taylor again ordered that Roman be returned to cell 32.  (*Id.*)  Allegedly, Sergeant Taylor asked Roman if he wanted to "keep playing games" and told Roman that "this is [Sergeant Taylor's] house" and "this is what happens when you go against him[.]"  (*Id.* at 19–20.)  The next shift, Sergeant Ramos again returned Roman to an undamaged cell and told Roman that security had been "informed to end this retaliation."  (*Id.* at 20.)

## II.    PROCEDURAL HISTORY

Roman filed this action on April 27, 2023.  (Doc. No. 2.)  On May 15, 2023, he filed an amended complaint (Doc. No. 17) against PrimeCare and all the County Defendants except Deputy Warden Roberts, and on June 23, 2023, he submitted what the Court has interpreted as a supplemental complaint (Doc. No. 30), which named Deputy Warden Roberts and Aramark as additional Defendants.

On August 23, 2023, the Court granted Roman's motion for appointment of counsel, referred this matter to the Court's Prisoner Civil Rights Panel, and stayed the action pending resolution of that referral.  (Doc. No. 56.)[4]  When no attorney volunteered to represent Roman, the Court lifted the stay on February 26, 2024.  (Doc. No. 98.)  One month later, the County Defendants and Aramark moved to dismiss the Complaint.  (Doc. Nos. 101, 103.)  PrimeCare did not join either motion and instead, filed an answer to the Complaint.  (Doc. No. 102.)

## III.    STANDARD OF REVIEW

As noted above, the County Defendants and Aramark have moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).  (*See* Doc. Nos. 101, 103.)  "A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint."  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss under Rule 12(b)(6), a court must consider whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Bell Atl. Corp.*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations

---

[4] While the case was stayed, the Court denied three motions for a temporary restraining order and/or a preliminary injunction filed by Roman.  (Doc. Nos. 59, 86, 96.)

omitted).  It is the defendant's burden to show that a complaint fails to state a claim.  *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).  To determine whether a complaint filed by a *pro se* litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally).

Additionally, because Roman is proceeding *in forma pauperis*, the Court may independently screen his Complaint and dismiss improper claims pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  *See Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim.").  The standard under this screening provision is the same standard that governs a dismissal under Rule 12(b)(6).  *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

## IV.    DISCUSSION

Roman's claims arise under 42 U.S.C. § 1983.[5]  Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be

---

[5] Roman's Complaint also references 37 Pa. Code § 95.223(4) (*see* Doc. No. 17 at 8), which requires state correctional institutions to have a "written local policy" that "permit[s] every inmate to make a request or submit a grievance to the prison administration, the judiciary or other proper authorities without censorship as to substance."  Even assuming Roman has alleged a violation of § 95.223(4), that

> subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  "[T]o state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law." *Jenkins v. Cordova*, Civ. No. 22-6482 (KM) (CLW), 2023 U.S. Dist. LEXIS 84428, *9 (D.N.J. May 15, 2023) (citing *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011)).

"In evaluating a § 1983 claim, courts must 'identify the exact contours of the underlying right said to have been violated' and 'determine whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Moore v. Luffey*, 767 F. App'x 335, 339 (3d Cir. 2019) (quoting *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015)).  When a § 1983 claim is brought against an individual defendant, the court must "next determine whether the plaintiff has demonstrated the 'defendant's personal involvement in the alleged wrongs.'" *Id.* (quoting *Chavarriaga*, 806 F.3d at 222).  When the claim is brought against a local government or municipality, however, the court cannot hold the municipality liable on "a vicarious liability theory rooted in *respondeat superior*." *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that local governments and municipalities are also considered persons under § 1983).  Instead, local governments and municipalities may be sued directly under § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation,

---

regulation does not create a private cause of action, nor is a violation of the regulation the proper subject of a civil rights action brought under § 1983.  *See Yunik v. McVey*, Civil Action No. 08–1706, 2010 WL 4777623, at *5 (W.D. Pa. Nov. 16, 2010) ("To the extent that Plaintiff seeks to sue Mr. Mangino for violations of state laws and rules, we find that such fails to state a claim under Section 1983 because in order to state a claim under Section 1983, the Plaintiff must allege a violation of his federal rights and not merely a violation of state law.").

or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.

Here, Roman contends that Defendants are liable under § 1983 because they:  (1) violated his Eighth and Fourteenth Amendment rights when they were deliberately indifferent to his serious medical needs, and (2) violated his First Amendment rights when they retaliated against him for filing a PREA complaint and multiple grievances.  (*See* Doc. Nos. 17, 30.)  The County Defendants and Aramark argue that Roman's § 1983 claims fail because he has not alleged constitutional violations, and in the alternative, he has not alleged facts to support a finding of individual or municipal liability.  (Doc. Nos. 101, 103.)

### A.    Deliberate Indifference to Serious Medical Needs

First, Roman brings Eighth and Fourteenth Amendment claims for deliberate indifference to medical needs, which are based on Defendants delaying access to preventative and corrective dental care and failing to provide appropriate meals under Roman's prescribed soft food diet. (Doc. No. 17 at 12, 14, 21, 24; Doc. No. 30 at 7, 9–10, 14–15, 18, 21.)[6, 7]

### 1.    Legal Standard

Because Roman was a pretrial detainee while at CCP, his medical treatment claims are

---

[6] Roman also raises deliberate indifference claims against the County Defendants for the denial of mental health treatment, claiming that the County refused to house Roman on the "mental health block" and denied Roman's requests for mental health "appointments."  (Doc. No. 17 at 15, 24.)  The County Defendants do not address these claims in their motion, so the Court will allow them to proceed to discovery as against the County.  The Court will, however, dismiss these claims as against the individual County Defendants because an independent review of the Complaint shows that Roman has not alleged that any individual was personally involved in the alleged denial of mental health treatment.  *See Moore*, 767 F. App'x at 339.

[7] In his opposition brief, Roman asserts that Defendants also failed to timely provide him with special shoes, which he argues were medically necessary.  (Doc. No. 106 at 7.)  The Court does not consider this issue because it is not raised in his Complaint.  *See Pa. ex rel. Zimmerman v. PepsiCo., Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (explaining that a complaint may not be amended by a plaintiff's brief in opposition to a motion to dismiss); *Ernst v. Union Cnty. Conservation Dist.*, No. 21-1702, 2023 WL 6276698, at *12 n.65 (M.D. Pa. Sept. 26, 2023) (same).

governed by the Fourteenth Amendment's Due Process Clause—which "protects pretrial detainees from 'any and all punishment'"—not the Eighth Amendment's prohibition on cruel and unusual punishment. *Happel v. Bishop*, 1:23-CV-13-SPB-RAL, 2024 WL 1508561, at *10 (W.D. Pa. Feb. 22, 2024) (quoting *Montgomery v. Aparatis Dist. Co.*, 607 F. App'x 184, 187 (3d Cir. 2015)); *see also Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005) (recognizing "distinction between pretrial detainees' protection from 'punishment' under the Fourteenth Amendment, on the one hand, and convicted inmates' protection from punishment that is 'cruel and unusual' under the Eighth Amendment, on the other"); *Montgomery v. Ray*, 145 F. App'x 738, 740 (3d Cir. 2005) ("While the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner, the proper standard for examining such claims is . . . whether the conditions of confinement (or here, inadequate medical treatment) amounted to punishment prior to an adjudication of guilt." (cleaned up)).  Although the two standards are not identical, the Eighth Amendment analysis informs the Fourteenth Amendment analysis, serving "as a floor for due process inquiries into medical and non-medical conditions of pretrial detainees." *Montgomery*, 145 F. App'x at 740 (citing *Hubbard*, 399 F.3d at 165–67).  "To state a claim under the Eighth Amendment, an inmate must allege:  (1) a serious medical need; and (2) behavior on the part of prison officials constituting deliberate indifference to that need." *Happel*, 2024 WL 1508561, at *10 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Under the first prong, a "medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks omitted).  "The seriousness

11

of an inmate's medical need may also be determined by reference to the effect of denying treatment." *Id.* When a denial or delay of adequate care results in the "unnecessary and wanton infliction of pain," *id.* (quoting *Estelle*, 429 U.S. at 103), or "causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious," *id.*

Under the second prong, an official acts with "deliberate indifference" when the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed" (internal citations and quotation marks omitted)). This is a subjective inquiry. *See Moore*, 767 F. App'x at 340. Not every complaint of inadequate prison medical care rises to the level of deliberate indifference. *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023). Allegations of medical malpractice, negligence, and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Hayes v. Gilmore*, 802 F. App'x 84, 88 (3d Cir. 2020). Nonetheless, "prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier or less efficacious treatment' of the inmate's condition." *Spruill*, 372 F.3d at 228 (quoting *West v. Keve*, 571 F.3d 158, 162 (3d Cir. 1978)).

### 2.    Delay in Dental Care

The Court begins with Roman's claim that the County Defendants were deliberately indifferent to his serious medical needs when they delayed access to preventative and corrective dental care for more than 20 months.

a.    *Constitutional Violation*

The County Defendants do not explicitly dispute that Roman suffered from a serious

medical need, and the Court has no problem finding that Roman's need was "serious" when he

saw the prison's dentist in April 2023.  (*See* Doc. No. 17 at p. 23 (alleging that at that time, two

teeth "were extracted . . . , [t]hree other teeth have gone from cavity to broken and decaying

including a front visible tooth at risk of needed extraction, multiple cavit[ie]s still exist" and

Roman was enduring "extream [sic] pain, sensitivity, infection even after antibiotics are

given").)[8]  It is unclear, however, when Roman's injuries first developed.  Roman alleges that

when he entered CCP he told PrimeCare employees that he had scheduled appointments for

dental care, but he does not explain the nature of those appointments or allege the nature of the

injuries, if any, that he suffered at the time.  (*Id.* at 14, 24.)[9]  Nevertheless, given that Roman

requested "corrective" treatment during his intake exam, submitted numerous requests for dental

treatment in the months that followed, and ultimately suffered serious and substantial injuries to

multiple teeth, the Court finds that Roman has sufficiently alleged a serious medical need for

purposes of this motion.

Assuming that Roman did suffer from a serious medical need when he entered CCP on

August 21, 2021, the County Defendants argue that they were not deliberately indifferent to that

---

[8] The Court also has no trouble finding that the prison officials were not deliberately indifferent to Roman's serious medical need in April 2023 because the prison dentist provided immediate treatment while CCP administrators searched for a specialist.

[9] Although not in the body of his Complaint, Roman does state in a grievance attached to his Complaint that he "chipped [his] teeth a few weeks after being arrested."  (Doc. No. 17 at 52.)  But that alone does not necessarily show that he suffered from a serious medical need.  *See Tormasi v. Hayman*, Civil Action No. 09–5780 (JAP), 2010 WL 716068, at *1 (D.N.J. Mar. 1, 2010) (dismissing the plaintiff's Eighth Amendment claims related to chipped tooth for those periods where the plaintiff "experienced no pain or bleeding," and where he "experienced minor bleeding and/or slight degree of pain"); *id.* at *2 (dismissing the plaintiff's claim related to the "preservation of Plaintiff's tooth" because it "facially fails to state a claim under the Eighth Amendment").

medical need because Roman "was seen by a dentist on April 26 and April 27, 2023." (Doc. No. 101 at 21.) But that treatment occurred more than 20 months after Roman entered the prison. As this Court previously explained (*see* Doc. No. 25 at 7 n.5), a substantial delay in treatment for non-medical reasons can itself rise to the level of deliberate indifference. *See, e.g.*, *Monmouth Cnty. Corr. Institutional Inmates*, 834 F.2d at 346 ("[I]f necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (cleaned up)); *Parkell v. Danberg*, 883 F.3d 313, 337 (3d Cir. 2016) (explaining that a correctional official is deliberately indifferent when they "delay[ ] necessary medical treatment based on a non-medical reason; or . . . prevent[ ] a prisoner from receiving needed or recommended medical treatment" (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999))); *Harrison v. Barkley*, 219 F.3d 132, 137–38 (2d Cir. 2000) (finding deliberate indifference where the plaintiff "adduced evidence to show . . . that his cavity was left untreated for one year").

Attempting to address the significant delay, the County Defendants assert that "from the time of his intake on August 29, 2021, until filing his Compliant [sic] on April 27, 2023, Plaintiff was seen by a dentist at CCP six (6) times." (Doc. No. 101 at 21.) They do not, however, provide any supporting documentation for this assertion, nor is it supported by the allegations in the Complaint, which this Court must accept as true in deciding the motions to dismiss. In other words, the Court must at this stage take as true Roman's allegations that he went 20 months without receiving any dental care.

Accordingly, the Court finds that Roman has alleged a plausible constitutional violation by the County in connection with the extended delay surrounding his dental treatment.

### b.    Individual Liability

Next, the County Defendants argue that even if Roman has stated plausible constitutional violations, the Fourteenth Amendment claims should be dismissed as against the individual

County Defendants because he has not alleged any individual's "personal involvement in the alleged wrongdoing."  (Doc. No. 101 at 19 (quoting *Mincy*, 508 F. App'x at *103); *see also id.* at 22 ("Warden Phillips, Maj. Taylor, Deputy Warden Miller, Director Mulrooney, Capt. Sergi, and Deputy Warden Roberts have no personal involvement with Plaintiff . . . .").)  The Court agrees that Roman has not alleged any facts from which the Court can infer any individual Defendant's personal involvement in the substantial delay of dental care.  Although he claims CCP's dentist told him in April 2023 that unidentified "officers" failed to bring Roman to an appointment the dentist had scheduled the week prior, Roman has not attributed that failure to any named Defendant.  Likewise, Roman states in conclusory terms that Sergeant DiOrio denied Roman medical escorts, but he does not allege when those denials occurred or otherwise tie Sergeant DiOrio's conduct to the lack of adequate dental care.  Accordingly, the Court dismisses Roman's Fourteenth Amendment claims as against the individual Defendants.  *See Moore*, 767 F. App'x at 339 (explaining that the plaintiff must allege "the 'defendant's personal involvement in the alleged wrongs'" (quoting *Chavarriaga*, 806 F.3d at 222)).  The dismissal is, however, without prejudice, and Roman will be given an opportunity to amend his Complaint to the extent he can do so in good faith.

### c.    *Municipal Liability*

The County Defendants similarly argue that Roman has failed to allege facts to support a finding of municipal liability under *Monell* because he has made only "vague references to policy," which "fall[ ] woefully short of the proof needed to support a *Monell* claim."  (Doc. No. 101 at 24.)  In the same breath, however, the County Defendants concede that Roman has identified an official CCP policy at the root of his dental injuries:  "Plaintiff states that prison policy is to either extract an inmate's tooth or to treat the inmate for pain until they are released." (*Id.*)  Roman has tied this policy to his alleged constitutional violation, explaining that when he

asked for corrective dental care, he was repeatedly told that it was not an option under the prison's extract or wait policy. (*See* Doc. No. 17 at 14, 24.) Neither waiting nor extracting was an appropriate course of treatment for Roman, however, because his injuries allegedly were not responding to antibiotic treatment and he suffers from osteogenesis imperfecta and cannot later replace teeth that are extracted. (*Id.* at 14.)

The County Defendants argue that these allegations are nevertheless insufficient because the extract or wait policy is "a commonly used policy in prisons and jails throughout the country as they have limited resources and must allocate those resources to treat the maximum number of inmates." (Doc. No. 101 at 24.) But the County's justification for the extract or wait policy does not render it immune from suit when that policy results in a constitutional violation, nor does the fact that other prisons have adopted similar policies.

Last, the County Defendants argue that Roman's allegations are insufficient because he "has not and is unable to identify any patterns of similar constitutional violations against Chester County or CCP which would have put Defendants on notice that the current dental treatment policy was in violation of the [C]onstitution." (Doc. No. 101 at 25–26.) This confuses the "policy" prong of the *Monell* analysis with the "custom" prong. As explained above, a municipality may be held liable under § 1983 only "when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by them." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell*, 436 U.S. 658). Put differently, a municipality "may not be held liable on a theory of vicarious liability rooted in respondeat superior," but it may be held liable "when the injury inflicted is permitted under its adopted policy or custom." *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (citing *Beck*, 89 F.3d at 971). "Policy is made when a

decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Mulholland*, 706 F.3d at 237 (quotation marks omitted). And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." *Id.* (quotation marks omitted). Allegations of knowledge and acquiescence are required only under the custom prong. *See McTernan v. City of York*, 564 F.3d 636, 658–59 (3d Cir. 2009) (explaining that to allege an actionable municipal custom, the complaint must identify the custom with specificity and demonstrate "knowledge and acquiescence by the decisionmaker"); *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) ("[T]o sustain a § 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."). Because Roman alleges that he suffered a constitutional injury as a result of CCP's official policy regarding dental treatment, he need not also allege knowledge and acquiescence.

Accordingly, the Court denies the County Defendants' motion to dismiss Roman's Fourteenth Amendment claim for delayed dental care as against the County.

### 3.  Soft Food Diet

Roman also brings Fourteenth Amendment claims against Aramark, alleging that the company was deliberately indifferent to his serious medical needs when it failed to provide a soft food diet as prescribed by Roman's dentist, "causing further injury to [Roman's] teeth." (Doc. No. 30 at 7, 9–10, 14–15, 18, 21.)

#### a.    Constitutional Violation

Aramark does not contest that Roman has alleged a serious medical need, in that his dentist prescribed a soft food diet. *See Talley v. Amarker*, No. CIV.A. 95–7284, 1996 WL

17

528867, at *2 (E.D. Pa. Mar. 7, 1996) ("Plaintiff has alleged a serious medical need because he has alleged that his diet was medically prescribed.").  Instead, Aramark argues that Roman's claim fails because Roman has not shown deliberate indifference, and more specifically, has failed to "assert any facts suggesting that an Aramark individual acted intentionally, delayed medical treatment for a non-medical reason, or prevented the Plaintiff from receiving medical treatment." (Doc. No. 103-2 at 9–10.)  Liberally construing the allegations in the Complaint, the Court finds Roman has sufficiently alleged deliberate indifference.

A food provider acts with deliberate indifference when it fails to provide a specific diet despite knowing that it is medically required.  *See Talley*, 1996 WL 528867, at *2 (finding the "plaintiff has alleged both serious medical needs and deliberate indifference" where he "alleged that Aramark failed to provide him with his diet over a period of six weeks, even though they were aware that it was medically required"); *Skelton v. Branganza*, Civil No. 19-18597 (RMB-SAK), 2024 WL 939688, at *7 (D.N.J. Mar. 4, 2024) ("It is plausible that the Dietician Defendants were aware that the diets they designed, as alleged in the TAC, did not comply with medically prescribed diets for prisoners with diabetes and other conditions.  Plaintiff's claims of deliberate indifference to a serious medical need can proceed against the Dietician Defendants.").

Here, Roman alleges that he was prescribed a soft food diet on May 31, 2023, and that as of June 19, 2023, when he signed his supplemental complaint, Aramark "continue[d] to provide meals that are against medical prescription." (Doc. No. 30 at 10; *id.* at 21 (copy of "Medical Diet Order Form," prescribing "Dental Soft Diet").)  In addition, Roman attaches to his Complaint multiple request slips—directed to correctional officers, Aramark's Office, and Roman's dentist—which suggest Aramark was aware that Roman needed a "soft food diet." (*See id.* at 15 (June 17, 2023 grievance slip to "Aramark Office," asking the recipient to "[p]lease

help end the delay of a medical based 'soft dental diet' that was prescribed by Dr. Zarkoski in order to prevent further injury"); *id.* at 16 (June 17, 2023 grievance slip alleging that "going on (18) days Ive [sic] been delayed my Dental Soft Diet which has left me vulnerable to injury").)

The Court finds these allegations sufficient at this stage to state a plausible constitutional violation.

### b.    *Municipal Liability*

Aramark argues that even if Roman has stated a constitutional violation, his Fourteenth Amendment claim nevertheless fails because Roman has not alleged facts to satisfy *Monell*. (Doc. No. 103-2 at 6–9.)  As a private company providing services to pretrial detainees pursuant to a municipal contract, Aramark stands in the same shoes as the municipality.  *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003); *Whitehurst v. Lackawanna County*, CIVIL ACTION NO. 3:17-cv-00903, 2020 WL 6106616, at *16 (M.D. Pa. Mar. 5, 2020) (citing *Natale* for the proposition that "§ 1983 liability for constitutional violations based on a municipal entity's policies and customs has been extended to apply to private companies providing prison medical services under contract").  Roman has not identified an Aramark policy or alleged any facts to suggest an Aramark custom was the cause of the delay of his soft food diet.  Accordingly, Aramark's motion to dismiss is granted.  Roman will, however, be given an opportunity to amend his Complaint to include such allegations if he can do so in good faith.  If Roman chooses to amend his Complaint, he should be mindful of the Court's discussion of *Monell* throughout this Memorandum.

\*        \*        \*

In sum, Roman's Fourteenth Amendment claims against the County for the 20-month delay of necessary dental care and the denial of mental health care services may proceed.  The Court dismisses without prejudice Roman's Fourteenth Amendment claims against the individual

County Defendants and Aramark.

### B.    Retaliation

In addition to his Fourteenth Amendment claims, Roman alleges that the County Defendants violated his First Amendment rights when they retaliated against him for filing grievances and a PREA complaint.  To state a plausible First Amendment retaliation claim, a prisoner must allege:  (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *Coit v. Garman*, 812 F. App'x 83, 86 (3d Cir. 2020).  Roman has identified four allegedly adverse actions:  (1) using the prison's suicide prevention policy to sexually harass him; (2) interfering with his ability to file additional grievances; (3) preventing him from attending medical appointments; and (4) moving him from cell to cell for no penological purpose.  The Court considers whether Roman has stated a constitutional claim as to each action in turn.

### 1.    Suicide Prevention

First, Roman claims that he was sexually harassed by Defendant Sergeant Mark DiOrio when, at some unidentified time, Sergeant DiOrio instituted CCP's suicide prevention policy against Roman after "a[n] argument."  (Doc. No. 17 at 10.)  Roman alleges that even though he was "compliant," "nonaggressive," and told Sergeant DiOrio that he had "NO suicidal or homicidal thoughts," Sergeant DiOrio nevertheless "forced" him to go to a cell without "toilet paper [or] soap" and to change into a "suicide smo[c]k" that was too small while Sergeant DiOrio watched.  (*Id.* at 10, 15–16.)  According to Roman, Sergeant DiOrio was "attempt[ing] to . . . punish[ ]" Roman "using a policy of suicide prevention."  (*Id.* at 10; *see also id.* at 15 ("Defendants herein named throughout complaint have targeted plaintiff by using customs in

place for suicide prevention to punish plaintiff . . . .").)  Roman has not, however, tied this

"punishment" to any constitutionally protected activity under the First Amendment.  (*See id.* at

10, 15–16 (claiming that the policy was instituted because of an "argument").)  As such, Roman

has not alleged a plausible constitutional violation, and the Court must grant the County

Defendants' motion to dismiss this claim.  Roman will, however, be given leave to amend.

### 2.     <u>Medical Escorts</u>

Next, Roman claims he has been denied medical visits "due to staff refusing to escort

[him] to appointments."  (Doc. No. 17 at 23; *see also id.* at 21 (alleging correctional officers

"refused to escort" Roman to a dental appointment on April 19, 2023).)  In one portion of his

Complaint, Roman claims this refusal was "due to [his] classification status" (*id.* at 23), which

does not implicate the First Amendment.  *See Thomas v. Independence Township*, 463 U.S. 285,

295 (3d Cir. 2006) (finding "the plaintiffs have adequately pled First Amendment retaliation

claims" where "the complaint alleges that the Individual Defendants have engaged in a campaign

of harassment and intimidation against plaintiffs *for exercising their First Amendment rights*"

(emphasis added)).  In another portion of his Complaint, however, Roman claims that he

"became a target" in the months after filing his PREA complaint, in that Sergeant DiOrio

"refused" to provide "medical escorts."  (*Id.* at 17.)

A prisoner's filing of a PREA complaint is constitutionally protected conduct.  *See*

*Robinson v. Palco*, No. 21-298, 2022 WL 3009746, at *3 (3d Cir. 2022) ("The misconducts, as

well as the resulting sanctions, were explicitly issued in response to Robinson's filing of PREA

complaints, which we have concluded 'implicates conduct protected by the First Amendment.'"

(quoting *Mitchell v. Horn*, 318 F.3d 523, 531 (3d Cir. 2003)).  And at least one federal district

court has found that interference with required medical appointments can rise to the level of an

"adverse action."  *See Oliver v. Calderon*, Case No. 6:17-cv-1792-Orl-31TBS, 2019 WL

1254844, at *5 (M.D. Fla. Mar. 19, 2019) ("Plaintiff's allegations that Defendants prevented him from attending medical appointments and denied him medical treatment as a result of filing grievances, if proven true, support a First Amendment violation.").  That leaves the third prong of the constitutional inquiry:  causal connection.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Ruttle v. Brady*, No. 22-3000, 2023 WL 5554648, at *2 (3d Cir. Aug. 29, 2023) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).  Roman filed his PREA complaint in early June 2022.  (*See* Doc. No. 17 at 16 ("Recorded phone calls to Prea on 06/08/22").)  Roman identifies only one date when he was denied a medical escort after that complaint was filed:  April 19, 2023.  (Doc. No. 17 at 21.)[10]  A ten-month delay is not "unusually suggestive."  *See Yu v. U.S. Dep't of Veterans Affairs*, 528 F. App'x 181, 185 (3d Cir. 2013) (defining "unusually suggestive" as "within a few days but no longer than a month").  Neither has Roman alleged a "pattern of antagonism" by Sergeant DiOrio, which "coupled with timing" could "establish a causal link."  *Ruttle*, 2023 WL 5554648, at *2.

Because Roman has not alleged a plausible constitutional violation, the Court grants the County Defendants' motion to dismiss this claim.  Roman will, however, be given leave to amend.

### 3.    Grievance Interference

Third, Roman alleges that Defendant Sergeant Taylor interfered with Roman's

---

[10] As noted above, Roman has not alleged that Sergeant DiOrio is the officer responsible for his missed dental appointment.

"grievance requests and inmate request slips." (Doc. No. 17 at 17.) Roman claims he "made extensive reports to [CCP's] medical/mental health" department and the "security department" and "all defendants in administration," but it was "to no avail" because "the request slips" were never received. (*Id.*) Roman believes they were not received by upper management because Sergeant Taylor "screens[,] interferes, and returns" the grievances "with a[n] answer (NO)!" (*Id.*) Once again, Roman has not tied the alleged interference to any constitutionally protected activity under the First Amendment. And even if we viewed the initial filing of the grievances as the constitutionally protected activity, the denial of those grievances was "not an 'adverse action' for retaliation purposes." *Owens v. Coleman*, 629 F. App'x 163, 167 (3d Cir. 2015). Because Roman has not alleged a plausible constitutional violation, the Court grants the County Defendants' motion to dismiss this claim. Roman will, however, be given leave to amend.

**4.    Cell Transfers**

Last, Roman alleges that all the individual Defendants "were involved in a campaign of harassment towards" Roman, moving Roman from "cell to cell" as a punishment for his "many attempts to file a grievance" against unidentified officers. (Doc. No. 17 at 11.) Specifically, Roman claims he was "moved (18) times in under (17) months" with 13 moves "based on provoked retaliation that [began on] 06/08/2022" when Roman filed his PREA complaint against Sergeant DiOrio. (*Id.* at 18.)[11] Grievances and informal oral complaints are protected conduct for purposes of a First Amendment retaliation claim. *See Watson v. Rozum*, 834 F.3d 417, 422

---

[11] In his opposition brief, Roman also asserts he was "involved in 'Jailhouse lawyer' aid to others at the time the retaliation began as well as complaints to multiple prison board members, local news papers and Disability Rights Pennsylvania Attorneys, right before Defendants . . . began their active [c]ampaign of [h]arassment through non-stop cell transfers and harassment." (Doc. No. 106 at 15.) Because these allegations are not included in the Complaint, the Court does not consider them. *See Pa. ex rel. Zimmerman*, 836 F.2d at 181 (explaining that a complaint may not be amended by a plaintiff's brief in opposition to a motion to dismiss); *Ernst*, 2023 WL 6276698, at *12 n.65 (same).

(3d Cir. 2016) (written grievances); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 300 (3d Cir. 2016) (oral grievances). However, the Court cannot find that Roman's cell transfers, when viewed collectively or individually, constituted an adverse action.

Notably, Roman concedes that "around 5" of the transfers were justified by his "own actions." (*See* Doc. No. 17 at 18); *see also Dillard v. Talamantes*, Civil No. 1:15-CV-974, 2018 WL 1518565, at *11 (M.D. Pa. Mar. 28, 2018) ("Dillard speculates that defendant Nye moved him to a different cell for the sole purpose of harassing and punishing him. However, Dillard concedes that on at least one occasion, he in fact requested a cell change because he did not get along with his cellmate due to their age difference."). As to the remaining 13 transfers, Roman discusses only one set of transfers in detail, alleging that he was moved five times between February 21, 2023 and February 23, 2023, when Sergeant Taylor and nondefendant Sergeant Ramos moved Roman between cell 32—which lacked "cable access"—and other cells that had cable access. (Doc. No. 17 at 19.)

"[U]nder some circumstances, a prison transfer may constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Chruby v. Bearjar*, CIVIL ACTION NO. 3:17-cv-01631, 2018 WL 4537404, at *12 (M.D. Pa. Aug. 27, 2018). "For example, a transfer into administrative or restrictive confinement, a less desirable cell or location within the prison, or a dangerous cell block might represent an adverse action." *Lawson v. Crowther*, Civil Action No. 17-39 Erie, 2018 WL 6524380, at *3 (W.D. Pa. Oct. 30, 2018) (collecting cases); *see also Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) ("[B]eing placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." (quoting *McKee*, 436 F.3d at 170)); *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) ("In the prison context, . . . the

following actions were sufficient to establish adversity: *several months in disciplinary confinement*; denial of parole, financial penalties, and transfer to an institution whose distance made regular family visits impossible; and *placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs*." *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (emphases added). In such cases, the cell transfers "have a strong deterrent effect." *Dillard v. Talamantes*, CIVIL NO. 1:15-CV-974, 2018 WL 1518565, at *11 (M.D. Pa. Mar. 28, 2018); *see also Griffin v. Malisko*, No. 1:18-cv-01155, 2018 WL 5437743, at *3 (M.D. Pa. Oct. 29, 2018). In contrast, cell transfers that result in only "[t]emporary inconveniences . . . do not meet this standard." *Griffin*, 2018 WL 5437743, at *3. "[W]hether a prisoner has met this prong of his retaliation claim will," however, "depend on the facts of the particular case." *Dillard*, 2018 WL 1518565, at *11.

For example, the plaintiff in *Griffin* argued that his transfer to a new cell with a shower that produced "brown water" was an adverse action. *Id.* at *3 & n.1. The district court disagreed, finding that the plaintiff had not satisfied this element of his retaliation claim because "his transfer from one cellblock to another similar cellblock is insufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Id.* The court emphasized that the plaintiff had failed to "allege for how long the water was allegedly brown" and that it "was clear from the complaint that Plaintiff suffered no physical harm from the brown water" and was "only temporarily housed in this cell." *Id.*; *see also Owens*, 629 F. App'x at 167 ("Owens' mere assertion that Appellees retaliated against him by placing him in a cell with a faulty shower does not meet the[ ] elements" of a First Amendment retaliation claim.); *Dillard*, 2018 WL 1518565, at *11 ("Simply moving Dillard to a different cell, and failing to allow him to [reside] with the inmate of his choice in a cleaner, quieter cell, cannot be considered 'adverse actions' sufficient to

deter a person of ordinary firmness from exercising his constitutional rights."); *Lawson v. Crowther*, Civil Action No. 17-39 Erie, 2018 WL 6524380, at *3 (W.D. Pa. Oct. 30, 2018) ("While transferring between equivalent cells within a short period of time may have been an annoyance, the Court cannot conclude that it would deter a person of ordinary firmness from exercising his constitutional rights.").

Here, like the plaintiffs in *Griffin*, *Owens*, *Dillard*, and *Lawson*, Roman has not alleged that his cell transfers rise to the level of adverse actions. The only difference between cell 32 and Roman's preferred cell is that cell 32 lacked "cable access," meaning Roman could not use his "$300 TV" during the few hours that he was housed in that cell in February 2023. (Doc. No. 17 at 19.)[12] The denial of cable, especially for such a short period of time, is a *de minimis* consequence that does not rise to the level of an adverse action. *See Snider v. Alvarez*, CIVIL ACTION NO. 18-801, 2020 WL 6395499, at *18 (M.D. Pa. Nov. 2, 2020) (finding that "turning off [the prisoner's] cable-TV for two weeks" did not "meet the level of adverse action"); *cf. Newmones v. Ransom*, No. 1:21-CV-00276-RAL, 2022 WL 4536296, at *5 (W.D. Pa. Sept. 28, 2022) ("The deprivation of cleaning supplies, showers, and recreation are *de minimis* inconveniences and not adverse actions.").

Because Roman has not alleged a plausible constitutional violation, the Court grants the County Defendants' motion to dismiss this claim. Roman will, however, be given leave to amend.

*        *        *

---

[12] In his opposition brief, Roman argues that he "has clearly proven he suffered some '[a]dverse [a]ction' at the hands of defendants when plaintiff[']s belongings and legal material was damaged due to the excessive cell transfers and the belongings being thrown in the cell by defendants." (Doc. No. 106 at 17.) Again, these allegations are not included in the Complaint, so the Court does not consider them. *See Pa. ex rel. Zimmerman*, 836 F.2d at 181 (explaining that a complaint may not be amended by a plaintiff's brief in opposition to a motion to dismiss); *Ernst*, 2023 WL 6276698, at *12 n.65 (same).

Roman has not alleged any plausible claims of First Amendment retaliation. Accordingly, the County Defendants' motion to dismiss is granted as to his First Amendment claims with the understanding that Roman will be granted leave to amend.

### C.    Punitive Damages

Last, the County seeks dismissal of Roman's request for punitive damages as against it, arguing that the Complaint "contain[s] no allegations that" the County was "motivated by an evil motive, [was] recklessly indifferent to Plaintiff's constitutional rights, or had any prior personal animosity towards Plaintiff."  (Doc. No. 101 at 27.)  "A jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Although the Court agrees Roman's allegations of intent are sparse, we find it more appropriate to address this issue at summary judgment.  Accordingly, the County's request is denied, with the understanding that the County may, if warranted, seek dismissal of the punitive damages request after discovery.

## V.    CONCLUSION

For the reasons discussed above, Roman's Fourteenth Amendment claims against the County survive to the extent Roman alleges CCP's policies resulted in delayed dental care and the denial of mental health care.  The Court also declines to strike Roman's request for punitive damages at this time.  Roman's remaining claims against the County, all of his claims against the individual County Defendants, and his claim against Aramark are dismissed.  Roman will, however, be given an opportunity to file an amended complaint to address the issues discussed in this Memorandum to the extent he can do so in good faith.  Roman is warned that leave to amend is limited, and any new pleading should not exceed the scope of this Memorandum.